05M - 1120 JGD

## AFFIDAVIT OF SPECIAL AGENT CHRISTIAN BRACKETT

Special Agent Christian Brackett deposes and states as follows:

## I. INTRODUCTION

1. I am a Special Agent with the United States Drug Enforcement Administration
(DEA). I have served in this capacity for 8 years and am currently assigned to the
Boston, Massachusetts Division Office. During my tenure as a Special Agent, I have
worked on dozens of drug investigations. I have written and/or participated in the
execution of numerous search warrants resulting in seizures, including large quantities of
controlled substances, large amounts of United States Currency, ledger books, bank
records, telephone books, receipts, drug customer lists and other documents relating to
the manufacturing, transportation, ordering, purchasing and distribution of controlled
substances. The information contained in this affidavit was either observed by me or
related to me by other law enforcement officers involved in this investigation.

2. I am submitting this affidavit in support of an application for a criminal
complaint charging Sophoan OUNG a.k.a. HERSHEY, Sophonara OUNG a.k.a. BEE,
Phan MOUL a.k.a. MAGEE a.k.a. TEAR DROP a.k.a. EVIL, Sokham SEAN a.k.a.
BLACK a.k.a. BLACKIE, Andre QUEZADA, a.k.a. Gilbert Quezada, and Scrouch
KHUT, a.k.a. JONNY (hereinafter referred to as "the Target Subjects") with conspiracy
to possess cocaine with intent to distribute, in violation of 21 U.S.C. 846; and possession
of a firearm in violation of 21 U.S.C. 924(c).

3. This affidavit includes a summary of events that I am personally familiar with
as well as the observations and knowledge related to me by other DEA agents, task force
officers, Lowell Police Officers and other Law Enforcement personnel that have been

working on this investigation.  This affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the "Target Subjects" have committed the aforementioned crimes described within the attached Criminal Complaint.

## II. TARGET SUBJECTS

4. **Sophoan OUNG a/k/a "Hershey,"** is an Asian male, approximately 5'6" tall, 150 lbs, with medium length dark hair.  "Hershey" has a Massachusetts driver's license number S54137218, which lists his date of birth as September 9, 1980 and his address as 26 Hillside Street, Unit 1, Lowell, MA.  Based on surveillance conducted during the course of this investigation and other information contained in this Affidavit, I believe that "Hershey" resides at 109 Forest Street, #2, in Lowell, MA.  As discussed later in this Affidavit, I believe that "Hershey" is the head of a drug trafficking organization operating in the Lowell, Massachusetts area, which distributes cocaine and possesses firearms. "Hershey's" criminal history reveals numerous arrests for burglary, taking a vehicle without the owner's permission, and possession of ammunition, the latter of which was dismissed.

5. **Sophanara OUNG a/k/a "Bee"** is an Asian male, approximately 5'6" tall, 140 lbs, with medium length dark hair and one longer piece of hair resembling a tail. "Bee" has a valid Massachusetts Identification card that lists his date of birth as February 20, 1985 and his mailing address as 26 Hillside Street, Unit 1, Lowell, MA.  No valid driver's license could be found for "Bee."  As discussed later in this Affidavit, I believe that "Bee" is the brother of "Hershey" and is a member of the targeted drug trafficking

organization operating in the Lowell, Massachusetts. "Bee's" criminal history reveals numerous arrests for attempted robbery and taking a vehicle without the owner's consent, none of which have recorded dispositions.

6. **Sokham SEAN, a/k/a "Blackie"** is an Asian male, approximately 5'8" tall, 160 lbs, with dark skin, long hair and a pointy goatee. SEAN ("Blackie") has an active Massachusetts Driver's license number S05312745, DOB: 2-27-1985, 1311 Middlesex Street Lowell, Massachusetts. Based on surveillance conducted during the course of this investigation, I believe that "Blackie" resides at 1311 Middlesex Street, #6, Lowell, Massachusetts. As discussed later in this Affidavit, I further believe that "Blackie" is a member of the targeted drug trafficking organization operating in the Lowell, Massachusetts area. Blackie's criminal history check reveals an arrest in California for exhibiting a deadly weapon (no disposition listed). Agents and officers have been unable to locate Blackie. Based on informant information, Blackie is presently believed to be in California.

7. **Phan MOUL, a/k/a "Magee" a/k/a "Evil" a/k/a "Tear Drop**  a dark skinned Asian male, approximately 5'6" to 5'7" tall, 160lbs, approximately 25 years old, with short dark hair and a goatee. "Magee" has a tattoo under his left eye of three or four teardrops. MOUL has an active Massachusetts Driver's license number S80257011, DOB: 12-01-1980 and a social security number of 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. As evidenced in this Affidavit, I believe that MOUL is a narcotics distributor and proceeds collector for "Hershey." A criminal history query indicates that MOUL has convictions for assault and battery and disorderly conduct.

8. **Andre QUEZADA, a/k/a Gilbert QUEZADA,** is an Hispanic male,

3

approximately 5'9" tall, 195 lbs, with black hair and a trimmed goatee. QUEZADA gave the residential address of 435 High Street, Lawrence, MA, with a date of birth of 11/23/78, during the booking process at the Lowell Police Department following his arrest on August 21, 2005. QUEZADA is believed to be a source of cocaine for Hershey and his distribution organization. QUEZADA's criminal history reveals an active warrant in Massachusetts for assault and battery by means of a dangerous weapon.

8A. **Srouch KHUT a.k.a. "Jonny" a.k.a. "Kevin"** is an Asian male, approximately 5'6" tall, 135 lbs, with dark hair. KHUT has a suspended Massachusetts Driver's license number 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, with a date of birth of 09-03-1973. KHUT has sold crack cocaine to CS6 on two occasions and is believed to be a customer of the organization based on information provided by CS3. KHUT's criminal history reveals a 2005 conviction for possession with intent to distribute cocaine as well as previous convictions for armed robbery, armed assault in a dwelling, and possession of a firearm.

## III.  LOCATIONS ASSOCIATED WITH THE TARGETS

### 109 Forest Street, #2, Lowell, MA

9. Through surveillance, intercepted conversations, information provided by a confidential source and electrical subscriber check agents have identified 109 Forest Street, Floor 2 as HERSHEY's residence. As discussed later in this Affidavit, two fully loaded handguns, ammunition and a small amount of cocaine were recovered from Hershey's residence in the early morning hours of August 21, 2005.

### 1311 Middlesex Street, #6, Lowell, MA

10. Through surveillance, intercepted conversations, information provided by a confidential source and an electrical subscriber check agents have identified 1311

4

Middlesex Street #6, Lowell, MA as a location used by BEE, MAGEE and BLACK to distribute cocaine and ecstasy. This location is often referred to as "CLUB 1" during intercepted conversations. As discussed later in this Affidavit, it is believed Magee moved cocaine and other items from this location in the early morning hours of August 21, 2005, at Hershey's instruction after members of Hershey's drug distribution operation detected undercover police surveillance. Police later recovered a portion of that cocaine – approximately one ounce – from an associate of Magee's.

**30 Angle Street, #37, Lowell, MA**

11. Through surveillance and intercepted conversations, agents identified 30 Angle Street, #37, Lowell, MA as another location used by HERSHEY, BEE, MAGEE and BLACKIE to distribute cocaine and to store firearms and ammunition. This location is often referred to as "CLUB 2" during intercepted conversations. As discussed later in this Affidavit, officers and agents executed a state search warrant at this location in the early morning hours of August 21, 2005, and discovered approximately 2 kilograms of cocaine, over 50 grams of crack cocaine, inositol (used to dilute cocaine), a small scale, a cocaine press, and two handguns. One of the weapons, a 9 mm Berretta, had obliterated serial numbers.

**135 Cross Street, #4, Lowell, MA**

12. Through surveillance, intercepted conversations and information provided by a confidential source, agents have identified 135 Cross Street #4, Lowell, MA as SROUCH KHUT's residence. As discussed later in this Affidavit, KHUT stored cocaine and drug related currency at his residence. On August 21, 2005, officers and agents executed a search warrant at KHUT's residence officers and found a cigarette package

5

containing approximately 10 packets of crack cocaine.

## IV. SOURCES OF PROBABLE CAUSE

**Confidential Sources**

13.    Six confidential sources (CS1, CS2, CS3, CS4, CS5, and CS6) have been used in this investigation. CS1, CS2, and CS3 have provided reliable information regarding the criminal activities of "Hershey" and "Bee," which as discussed later in this Affidavit, has been verified during the course of this investigation. CS1, CS2, and CS3 are able to conduct criminal activities with "Hershey" and "Bee" but are unwilling to record said criminal activities and are unwilling to testify because of fear of future retribution. CS4 has also provided information regarding criminal activity of "Hershey," "Bee," "Striker," and a Dominican cocaine source located in Lawrence, Massachusetts, some of which has been verified during the course of this investigation. CS4 has been unable to contact and/or engage in negotiations with any of the known members of the organization. Accordingly, CS4's usefulness in this investigation has been extremely limited. CS5 provided limited information regarding the organization but, as discussed below, is no longer available for use in this investigation. CS6 is a paid informant who has provided reliable information in the past. As discussed below, CS6 has provided information regarding KHUT but has not provided any information regarding "Hershey," or "Bee." CS6 is reluctant to testify unless he/she is relocated.

14.    In February of 2005, CS1 provided information that "Hershey" was running a cocaine trafficking organization in Lowell, Massachusetts. CS1 stated that "Hershey" obtains kilogram quantities of cocaine, which he breaks up and sells in smaller quantities to numerous individuals in the Lowell, MA area. According to CS1,

6

"Hershey" sells the cocaine for $1,200 to $1,000 per ounce. CS1 recently heard that
"Hershey" also stashes his cocaine in a garage at 1311 Middlesex Street, Lowell, MA.
According to CS1, "Hershey's" brother "Bee" distributes cocaine for him. CS1
originally advised that "Bee" and "Hershey" used telephone number 978-726-8895 to
conduct their drug distribution business. On a later date, CS1 advised that "Bee" had
changed his cellular number to (978) 726-8372 and that "Hershey" was using telephone
number (978) 569-5592.

15.    CS2 and CS3, who are associates of CS1, provided information that
"Hershey" and "Bee" distribute significant quantities of cocaine in the Lowell, MA area.
In May of 2005, CS3 provided information that one of "Hershey's" customers was
Srouch KHUT and that CS3 was aware of one specific occasion when KHUT received a
larger quantity of cocaine (approximately ½ kilogram) from "Hershey."

16.    In May of 2005, CS4 was debriefed and explained that CS4 was an
associate of "Hershey" but that "Hershey" no longer speaks with CS4. Last year, CS4
had a falling out with "Hershey" and since then, CS4 has attempted to speak with
"Hershey" but "Hershey" refuses to talk with CS4. Because of this, CS4 does not believe
it could provide any proactive cooperation against "Hershey". Through previous
association with "Hershey" and "Hershey's" associates, CS4 has learned that "Hershey"
has access to kilogram quantities of cocaine, which he receives from unknown
Dominican males in Lawrence, MA. CS4 has never personally met "Hershey's" source
but has been in the area in 2004 when "Hershey" either made a drug payment or obtained
cocaine from them. On one occasion, the CS4 observed the source deliver cocaine to
"Hershey" in Lowell, MA and another occasion CS4 drove "Hershey" to a bar on Essex

7

Street in Lawrence, MA to meet them.  CS4 does not believe that it can identify

"Hershey's" source but observed the source driving a dark colored Lexus with custom

rims.  According to CS4, "Hershey's" brother, Sophanara OUNG  ("Bee") and another

male known to CS4 as "Striker" distribute cocaine for "Hershey."  According to CS4,

"Hershey" and "Bee" grew up in San Diego, CA and still have a mother and brother,

named Sopheap, living in that area. CS4 stated that "Striker" is a friend of "Hershey" and

"Bee" from San Diego and was previously in a San Diego gang called the "Tiny Eastside

Cripts" (TEC).  CS4 described "Striker" as a dark skinned Asian Male with a pointy

goatee.  CS4 stated that "Hershey" and "Bee" resided at 26 Hillside Street in Lowell,

MA, in early 2005.  CS4 stated that "Hershey" previously stashed his cocaine at 26

Hillside Street but recently obtained a studio apartment at 1311 Middlesex Street, Lowell,

MA, which he now uses to store and package his drugs.  According to CS4, "Hershey"

has several firearms including assorted handguns and an AK47 Type assault rifle, which

may also be stored at 1311 Middlesex Street.  CS4 heard that some males who distribute

cocaine at 31 Belview Street, in Lowell, MA, obtain their cocaine from "Hershey."

According to CS4, the males receive 125 grams of cocaine from "Hershey" every day or

two and they drive a black Acura Integra and a blue Toyota Corolla, which CS4 has seen

at 1311 Middlesex Street between 8:00 a.m. and 8:30 a.m. in the morning.  CS4 believes

that this is the time that they pick up there cocaine from "Hershey."

       17.     Additionally, a fifth confidential source (CS5) provided information in this

case. CS5 was arrested in a drug related case and agreed to provide information in

exchange for potential leniency.  In approximately December, 2004, CS5 provided

information regarding the criminal activity of "Hershey," specifically that "Hershey" was

8

a cocaine distributor and that "Hershey" stashed his cocaine at 26 Hillside Street as well as other unrelated information. During an investigation of the other information provided, CS5 indicated that CS5's cooperation had been discovered and that CS5 needed to leave the area for CS5's safety. CS5 left the area and was then arrested in the new place and is currently incarcerated.

18.    CS6 provided information that KHUT was a cocaine distributor. In early July of 2005, CS6 contacted KHUT, at the direction of law enforcement, regarding the purchase of cocaine. CS6 conducted unrecorded negotiations with KHUT and on July 5, 2005, CS6 and an undercover officer (UC3) purchased approximately $100 of cocaine from KHUT. CS6 provided information that KHUT used telephone numbers (978) 399-8009 and (978) 349-1122. As discussed later in this Affidavit, CS6 made three additional controlled purchases of cocaine and cocaine base (crack) from KHUT, one on July 30, 2005, one on August 5, 2005, and one on August 9, 2005. As detailed later in this Affidavit, KHUT obtains cocaine from "Hershey" and "Magee."

**Undercover Agents / Officers**

19.    Three undercover agents/officers are involved in this investigation (UC1, UC2, and UC3). UC1 is a DEA agent with fifteen (15) years of law enforcement experience in the field of narcotics investigations. UC1 is not of Asian decent. As discussed later in this Affidavit, UC1 accompanied CS1 during the April 1, 2005 undercover purchase. During said purchase, "Bee" and "Blackie" did not engage in conversation with UC1. As a result, an investigative decision was made to substitute UC2 for UC1. UC2 is of Asian decent and has been a police officer for ten (10) years. UC2 has worked in the area of narcotics for seven (7) years. UC3 is a police officer of

9

four (4) years with approximately four (4) months of experience in the specific field of narcotics investigations.  As discussed above, UC3 was present during the July 5, 2005 purchase of cocaine by CS6 from KHUT.  UC3 was not present for subsequent transactions because CS6 stated that KHUT informed CS6 that he would not deal with CS6 if UC3 was present.

**Court Ordered Wiretaps**

20.    On July 25, 2005, at approximately 4:45 p.m., the Honorable Douglas P. Woodlock, United States District Judge, District of Massachusetts, signed an Order authorizing the interception of wire communications of Sophoan OUNG a/k/a "Hershey," Sophanara OUNG a/k/a "Bee," FNU LNU a/k/a "Striker" a/k/a "Blackie," FNU LNU a/k/a "McGee," Srouch KHUT, Scott MACDONALD, Donald Lee PARKER, and others as yet unknown, to and from the cellular telephone assigned number (978) 726-8372, bearing electronic serial number 2D658807, which is a Sprint cellular telephone subscribed to by Sombathperom Loy, 1311 Middlesex Street, Apartment # 4, Lowell, Massachusetts (hereinafter "**target telephone 1**").  The monitoring of the wire communications on target telephone # 1 began at approximately 11:30 a.m. on July 26, 2005 and terminated on August 21, 2005.  On August 16, 2005, the Honorable Richard Stearns, United States District Judge, District of Massachusetts, signed an Order authorizing the interception of wire communications of Sophoan OUNG a/k/a "Hershey," Sophanara OUNG a/k/a "Bee," FNU LNU a/k/a "Striker" a/k/a "Blackie," Phan MOUL a/k/a "McGee," Srouch KHUT, Scott MACDONALD, Donald Lee PARKER, Chanda MANY, Reginald Knight, Wayne Shay, FNU LNU "George", FNU LNU a/k/a "Duffy", FNU LNU a/k/a "Smiley", FNU LNU a/k/a "Scott" and others as yet unknown, to and

10

from the cellular telephone assigned number (978) 569-5592, bearing IMSI number

316010029553732, which is a Nextel cellular telephone subscribed to by Peter SONG, 70

Queen Street, Lowell, Massachusetts (hereinafter "**target telephone 2**"). The monitoring

of the wire communications on target telephone 2 began at approximately on August 16,

2005 and terminated on August 21, 2005.

## BACKGROUND INFORMATION

21.     As discussed in the previous section, law enforcement received

information from numerous sources that "Hershey," "Bee," and "Striker" were cocaine

traffickers who were dealing cocaine in Lowell and receiving said cocaine from a source

in Lawrence. In February of 2005, CS1 contacted "Hershey" through CS3 at the

direction of law enforcement and arranged to purchase two ounces of cocaine from

"Hershey." CS1 met with "Hershey" and purchased two ounces of a white powdery

substance, later determined to be 55.8 grams of 85% cocaine hydrochloride for $2,000.

The transaction was monitored by law enforcement, however, was not recorded. CS1

refused to wear a recording device because of CS1's fear of retribution.

22.     Surveillance was conducted during the above-referenced transaction.

Agents observed "Hershey" and after comparison with a Massachusetts Driver's License

picture determined that "Hershey" was in fact Sophoan OUNG.

23.     In early April of 2005, CS1 contacted "Hershey," once again at the

direction of law enforcement, and arranged to purchase two ounces of cocaine from

"Hershey." "Hershey" told CS1 that he would send his brother to the delivery. CS1 and

UC1 went to the pre-arranged location. Two persons were observed by law enforcement

and later determined to be "Bee" and "Blackie" (a/k/a "Striker"). "Blackie" tossed two

11

plastic bags containing a white powdery substance, later determined to be 55.7 grams of 86% cocaine hydrochloride, into the vehicle in which CS1 and UC1 were seated. UC1 handed "Blackie," who remained outside of the vehicle, $2,000. This meeting was not recorded.

24.    In mid April of 2005, CS1 contacted "Hershey," once again at the direction of law enforcement, and arranged to purchase two ounces of cocaine from "Hershey." "Hershey" told CS1 that he would send his brother to the delivery. UC2 traveled to the pre-arranged meet location with CS1 and CS3. "Bee" entered the vehicle and introduced himself as "Bee." "Bee" handed UC2 two clear plastic bags containing a white powdery substance, later determined to be 55.9 grams of 65% cocaine hydrochloride. UC2 handed "Bee" $2,000 in cash as payment for the cocaine. UC2 told "Bee" that UC2 would contact "Bee" directly for future transactions, meaning cocaine transactions, and "Bee" agreed. "Bee" told UC2 to get the number from them, indicating CS1 or CS3.

25.    Surveillance was conducted and agents observed "Bee" and "Blackie" get into a gray GMC Jimmy with Massachusetts registration number 55CP02, which was being driven by "Blackie." A registration check on that vehicle indicates that it is registered to Soda LOY, 26 Hillside Street, in Lowell, MA, which was Hershey's previous address. Agents observed the vehicle travel from the purchase location to 1311 Middlesex Street, in Lowell, Massachusetts. Surveillance and subsequent investigation determined that 1311 Middlesex Street is a multi-unit dwelling, believed to contain in excess of eight apartments.

26.    In light of the introduction of UC2, as discussed above, as well as CS1 and

CS3's unwillingness to be recorded or to testify, an investigative decision was made to remove CS1 and CS3 from the narcotics transactions.

**April 20, 2005 Undercover Purchase of Cocaine**

27.    On April 19, 2005, at approximately 8:10 p.m., UC2 placed an outgoing call to (978) 726-8895, which was "Bee's" cellular telephone number at the time. UC2 left a voice mail requesting a return call. This conversation was consensually recorded.

28.    On April 19, 2005, at approximately 8:15 p.m., UC2 received an incoming call from "Bee." During this call, UC2 told "Bee" that UC2 would be in Lowell the following day and would like two ounces, meaning two ounces of cocaine. "Bee" told UC2 to call him the following afternoon. This call was not recorded.

29.    On April 20, 2005, at approximately 2:26 p.m., UC2 placed a call to "Bee's" at (978) 726-8895. UC2 spoke to "Bee." UC2 stated that UC2 would be in Lowell around 5:00 p.m. "Bee" told UC2 to "call" when UC2 got there. UC2 stated that UC2 wanted "two ounces," referring to two ounces of cocaine. This conversation was consensually recorded.

30.    On April 20, 2005, at approximately 5:25 p.m., UC2 arrived at the pre-arranged location. UC2 placed a call to "Bee" at (978) 726-8895. UC2 spoke to "Bee" and told "Bee" that UC2 had arrived. "Bee" told UC2 to wait and that he would be driving a GMC Jimmy. This conversation was not recorded.

31.    Agents conducted surveillance at 1311 Middlesex Street, in Lowell. Agents observed and videotaped "Bee" exit 1311 Middlesex Street and depart in a gray GMC Jimmy, Massachusetts Registration number 55CP02. Agents also videotaped "Bee" arrive at the pre-arranged meet location. Agents confirmed, via comparison with a

13

Massachusetts Driver's license photograph of Sophanara OUNG, that "Bee" is Sophanara OUNG.

32.    On April 20, 2005, at approximately 5:29 p.m., "Bee" arrived at the purchase location in the gray GMC Jimmy and pulled next to the undercover vehicle. "Bee" was observed reaching towards the back seat of the GMC and retrieving two plastic bags. "Bee" attempted to pass the bags to UC2 through the window and UC2 told "Bee" not to pass them through the window. UC2 then entered "Bee's" vehicle and "Bee" handed UC2 the two plastic bags, later determined to contain cocaine. Subsequent laboratory analysis revealed that the substance was in fact 55.8 grams of 92% pure cocaine hydrochloride. UC2 gave "Bee" $2,000 as payment for the cocaine. UC2 exited the vehicle. This meeting was not recorded.

33.    Surveillance agents then observed "Bee" depart the area in the GMC and return to 1311 Middlesex Street.

**Voicemail from "Bee" on April 21, 2005**

34.    On April 21, 2005, at approximately 7:08 p.m., UC2 received a voice mail message from "Bee," telling UC2 not to call the old number, explaining that his new number was (978) 726-8372 (target telephone 1). Records from Sprint PCS indicate that on April 21, 2005, telephone number 978-726-8895 was changed to 978-726-8372. The electronic serial number (ESN), however, remained the same.

**May 17, 2005 Undercover Purchase of Cocaine**

35.    On May 17, 2005 at approximately 3:50 p.m., UC2 placed a telephone call to target telephone # 1. UC2 spoke to "Bee." UC2 told "Bee" that UC2 was going to be in the Lowell area in 15 minutes and asked "Bee" if he had "anything" which was a

14

cryptic reference to cocaine. "Bee" stated, "yeah." "Bee" asked UC2 "how much you looking for" and UC2 stated, "two ounces," which was a reference to two ounces of cocaine. UC2 then agreed to call "Bee" when UC2 arrived in Lowell. This conversation was consensually recorded.

36.    On May 17, 2005, at approximately 4:16 p.m., UC2 placed a telephone call to target telephone # 1. UC2 spoke to "Bee." UC2 told "Bee" that UC2 was in Lowell. "Bee" agreed to meet UC2 in about 5 minutes. UC2's portion of this conversation was consensually recorded.

37.    On May 17, 2005, surveillance was conducted at 1311 Middlesex Street. At approximately 4:19 p.m., agents observed two males depart 1311 Middlesex Street in a gray Ford Explorer, Massachusetts Registration number 22EK49. A registration check on that vehicle indicates that it is registered to Sophoan OUNG, 26 Hillside Street, Lowell, MA.

38.    On May 17, 2005, at approximately 4:20 p.m., "Bee" arrived at the meet location in the gray Ford Explorer. UC2 got into the back seat of the Explorer and "Bee" handed him an Oreo cookie box containing two plastic bags with a white powdery substance. This substance later field tested positive for the presence of cocaine and was subsequently determined to be 55.8 grams of 76% cocaine hydrochloride. UC2 handed "Bee" $2,000 for the cocaine and "Bee" counted the money in the presence of UC2. UC2 then asked "Bee" whether he had access to "Ice," a street term for the drug methamphetamine. "Bee" advised UC2 that his brother, who UC2 understood to mean "Hershey," was "trying to get it from California." "Bee" told UC2 that he would call UC2, which UC2 understood to mean "Bee" would let UC2 know if "Hershey" was able

15

to obtain the methamphetamine. "Bee" then introduced UC2 to the driver of the vehicle as "Blackie," who had just returned to the vehicle and had not been present during the transaction. This meeting was consensually recorded.

39.     On May 17, 2005, at approximately 4:24 p.m., agents observed "Bee" and "Blackie" depart in the Explorer depart heading towards 1311 Middlesex Street. At approximately 5:25 p.m., agents observed the gray Explorer arrive back at 1311 Middlesex Street with two male occupants, believed to be "Bee" and "Blackie."

**June 22, 2005 Undercover Purchase**

40.     On June 22, 2005, at approximately 3:28 p.m., an outgoing call was placed by UC2 to target telephone 1. UC2 spoke to "Bee." UC2 asked "Bee" if he was going to "be around," meaning available to deliver cocaine. "Bee" asked UC2 whether he could call UC2 back and explained "I want to make sure I have it for you." "Bee" then asked "for the usual right?" UC2 responded "the usual, just two." UC2 understood that "Bee" was going to check whether he had two ounces of cocaine available for sale to UC2. This conversation was consensually recorded.

41.     On June 22, 2005, at approximately 3:29 p.m., an outgoing call was placed from target telephone 1 to target telephone 2. Then at approximately 3:30 p.m., UC2 received an incoming call from target telephone # 1, as verified by the pen register/trap and trace device. UC2 spoke to "Bee." "Bee" stated "I have it for you," which UC2 understood to mean that "Bee" had the cocaine. "Bee" and UC2 agreed to meet in approximately a half an hour. UC2 stated that UC2 would contact "Bee" when he was at the pre-arranged site. I believe that "Bee" contacted "Hershey" at (978) 569-5592, to inquire regarding the availability of cocaine. This conversation was consensually

16

recorded.

42.    On June 22, 2005, at approximately 4:38 p.m., UC2 placed a call to target telephone # 1. UC2 spoke to "Bee." UC2 stated that he was at the meet location and "Bee" stated that he would meet UC2 there. UC2's portion of this conversation was consensually recorded.

43.    On June 22, 2005, at approximately 4:58 p.m., UC2 received an incoming call from target telephone # 1, as verified by pen register/trap and trace information. "Bee" told UC2 that he was leaving to meet UC2 but that he needed to make a stop first. UC2's portion of this conversation was consensually recorded.

44.    On June 22, 2005, surveillance was established at 1311 Middlesex Street in Lowell, Massachusetts. At approximately 5:01 p.m., agents observed a gray Ford Explorer, MA registration number 22EK49 -- the same vehicle used by "Bee" during the May 17, 2005 delivery -- arrive at 1311 Middlesex Street. Agents observed a male exit the vehicle, enter the house, exit the house, and enter the same vehicle. Agents then observed the same vehicle travel to the pre-arranged meet location and park next to the UC's vehicle.

45.    On June 22, 2005, at approximately 5:06 p.m., UC2 got into the Ford Explorer, met with "Bee" and an unidentified male introduced as "Magee." "Magee" handed UC2 a Scooby snack dog treat box. Inside that box were two clear plastic bags containing a white powdery substance, one of which later field-tested positive for cocaine. UC2 handed "Bee" $2,000 as payment for the cocaine. "Bee" counted the money. UC2 exited the vehicle, entered UC2's vehicle and departed the area. The exchange was consensually recorded.

17

46.    Surveillance agents observed the Explorer with "Bee" and "Magee" return to 1311 Middlesex Street.  Surveillance was terminated.

**THE WIRETAP PHASE OF THE INVESTIGATION**

47.    As noted above, on July 25, 2005, United States District Court Judge Douglas P. Woodlock signed an Order authorizing the interception of wire communications of Sophoan OUNG a/k/a "Hershey," Sophanara OUNG a/k/a "Bee," FNU LNU a/k/a "Striker" a/k/a "Blackie," FNU LNU a/k/a "McGee," Srouch KHUT, Scott MACDONALD, Donald Lee PARKER, and others, over target telephone 1.  The monitoring of the wire communications on target telephone 1 began at approximately 11:30 a.m. on July 26, 2005 and is ongoing.  On August 16, 2005, United States District Court Judge Richard Stearns signed an Order authorizing the interception of wire communications of Sophoan OUNG a/k/a "Hershey," Sophanara OUNG a/k/a "Bee," FNU LNU a/k/a "Striker" a/k/a "Blackie," Phan MOUL a/k/a "McGee," Srouch KHUT, Scott MACDONALD, Donald Lee PARKER, Chandra MANY, Reginald Knight, Wayne Shay, FNU LNU "George", FNU LNU a/k/a "Duffy", FNU LNU a/k/a "Smiley", FNU LNU a/k/a "Scott" and others over target telephone 2.  Monitoring of communications began at approximately on August 16, 2005 and is ongoing.

48.    The following section describes certain conversations intercepted over target telephone 1 and target telephone 2, concerning the distribution of narcotics, collection of drug proceeds and possession of firearms, along with related surveillance in response to the calls.

49.    To the extent that portions of conversations have been attributed to certain individuals, those identifications have been made either through the interceptee's

18

identification of him or herself by name during the course of the conversation, available subscriber information and/or voice comparison by monitors, surveillance of targets in conjunction with intercepted telephone conversations, and information provided by confidential sources. Some of the intercepted calls are in the Cambodian language and I have relied on Cambodian police officers and monitors to translate the calls from Cambodian to English.

50.    I have not summarized every pertinent intercepted call, nor have I included every pertinent part of the calls I have summarized. Furthermore, any transcriptions of intercepted calls are preliminary and in draft form. As such, the summaries set forth in this affidavit are preliminary in nature. My opinions concerning the meaning of the coded or veiled conversations are based on my training and experience and expertise developed as a result of investigating the distribution of controlled substances.

51.    On July 26, 2005, at approximately 12:33 p.m., an outgoing call was placed on target telephone 1 to target telephone 2. "Magee" spoke to "Hershey." "Hershey," who answered to that name during intercepted wiretap communications, asked "Magee" where he was and "Magee" replied "here." "Hershey" told "Magee" that "it" was under the couch. I believe that "Magee" was picking up cocaine and that "Hershey" was instructing "Magee" where the cocaine was located. I further believe that Magee was at 30 Angle Street at the time of the above call because a later search of that location (described in detail below) uncovered a large amount of cocaine underneath a couch in 30 Angle Street.

52.    On July 26, 2005, a series of conversations were intercepted between

19

target telephone 1 and telephone number (978) 996-2344. At approximately 3:58 p.m., an incoming call was received on target telephone 1. "Magee" spoke to a male believed to be Reginald KNIGHT. KNIGHT told "Magee" that he wanted an "8 ball" at approximately 4:30 at "my house, 43 Bowden Street." At approximately 4:36 p.m., an incoming call was received on target telephone 1. KNIGHT told "Magee" that he was waiting for his "8 ball" order. I believe that these conversations concerned the fact that KNIGHT wanted delivery of 3.5 grams of cocaine – commonly called an "8 ball" on the street -- from "Magee." At approximately 5:02 p.m., agents performing physical surveillance observed "Magee" arrive at 43 Bowden Street. A dark skinned male exited the building, met with "Magee" briefly, and then re-entered the building. The male is believed to be KNIGHT based on a comparison with a Massachusetts Driver's License photograph as well as subscriber information on the telephone used at 43 Bowden Street.

53.     On July 26, 2005, at approximately 5:59 p.m., an outgoing call was placed on target telephone 1 to (978) 606-8117. "Magee" spoke to "Bee" and asked for "Blackie." "Magee" asked "Blackie" whether they had the one that had been "cooked." "Blackie" stated that there were plenty and stated that all they needed were smokers. "Blackie" asked whether he wanted a whole one and "Magee" stated that he wanted "20." "Magee" stated that he would come to "Blackie's" house. I believe that this conversation pertained to crack cocaine (the one that had been cooked) that "Magee" intended to pick up from "Blackie" so that they could distribute it to users or customers (termed "smokers").

54.     At approximately 5:37 p.m., an outgoing call was placed on target telephone 1 to (978) 996-9676, subscribed to Chanda MANY, 1360 Middlesex Street,

20

Lowell, MA.  Magee spoke with an unknown male who asked MAGEE to deliver "one" to him.  MAGEE told the male it would be about ½ an hour.  I believe this conversation concerned the delivery of either powder or crack cocaine.

55.    In response to the calls, surveillance was established in the vicinity of 1311 Middlesex Street and 1360 Middlesex Street, Lowell, MA.  At approximately 6:03 p.m., agents observed a black Nissan Maxima, MA registration 13VA32, registered to Sophoan OUNG (a.k.a. "Hershey"), pull into the driveway of 1311 Middlesex Street and park next the building.  About a minute later, agents observed the Maxima pull out of 1311 Middlesex, drive to 1360 Middlesex Street and pull into the driveway to the left of the residence.  After a few minutes, agents observed the vehicle depart 1360 Middlesex Street.  Agents conducted mobile surveillance of the Maxima taking several rights and lefts through local streets in a manner consistent with the occupant attempting to detect police surveillance.

56.    On July 26, 2005, at approximately 6:12 p.m., an outgoing call was placed on target telephone 1 to an unknown number.  "Magee" spoke to "Blackie."  "Magee" told "Blackie" to hide everything and explained that a male had noticed vehicle following him.  As discussed above, surveillance was being conducted on "Magee" on July 26, 2005, and Magee accurately identified the make of one of the surveillance.  I believe that this conversation demonstrates that individuals in "Hershey's" drug organization perform counter surveillance, and on this specific occasion "Magee" had detected police surveillance.

57.    On July 27, 2005, at approximately 1:00 p.m., an incoming call was received on target telephone 1 from telephone number (978) 454-7379.  "Magee" spoke

21

to FNU LNU a/k/a "George." FNU LNU a/k/a "George" asked "Magee" if he had "three" for cash. "Magee" told FNU LNU a/k/a "George" that he didn't have anything but that he would call and see if he could get some. I believe that FNU LNU a/k/a "George" wanted to purchase a quantity of cocaine ("three"), but that "Magee" didn't have any in his possession at that time.

58. On July 27, 2005, at approximately 1:01 p.m., an outgoing call was placed on target telephone 1 to target telephone 2. "Magee" spoke to "Hershey." "Magee" told "Hershey" that "George" wanted "three CDs" for cash. "Hershey" stated that he couldn't get "shit." I believe that "Hershey" is a supplier for "Magee" and that "Hershey" didn't have any cocaine at that time either.

59. On July 28, 2005, at approximately 3:58 p.m., an incoming call was received on target telephone 1 from telephone numbered (978) 996-9676, which is subscribed to by Chanda MANY, at 1360 Middlesex Street, C, Lowell, Massachusetts. "Magee" spoke to MANY, who has identified herself during intercepted conversations as "Chanda." MANY asked who she was speaking to and "Magee" stated the guy that went to L.A. MANY asked "Magee" to ask "Hershey" whether he would sell MANY "powder 25 cents for 250." "Magee" stated that he would try to call him. I believe that this conversation concerned a cocaine transaction and that MANY wanted to purchase 1/4 ounce of cocaine for $250.

60. On July 28, 2005, at approximately 4:00 p.m., an outgoing call was placed on target telephone 1 to target telephone 2. "Magee" spoke to "Hershey." "Magee" stated that "Chanda" wanted "25 cents and something 250." "Hershey" asked "25 cents rock?" "Magee" stated "powder." "Hershey" stated that he would call her. I believe "25

cents" as used in this conversation was a reference to 1/4 ounce of cocaine; that "rock" was a reference to crack cocaine; and that "powder" was a reference to powder cocaine. I further believe that "Hershey" was going to contact MANY directly regarding her request for cocaine.

61.     At approximately 4:33 p.m., agents observed Magee's green Nissan Maxima Massachusetts Registration 99WJ44 pull out of the parking area for 1311 Middlesex Street, drive down Middlesex Street and pull over directly across from 1360 Middlesex Street. About a minute later, agents drove past 1360 Middlesex Street and noticed that the Maxima was no longer in the vicinity of the residence.

62.     On July 29, 2005, at approximately 7:37 p.m., an incoming call was received on target telephone 1 from telephone number (978) 349-1122, which is a telephone number I believe to be used by Srouch KHUT. KHUT told "Magee" to give him "three at home." I believe that KHUT was requesting three ounces of cocaine from "Magee" and that KHUT wanted the cocaine delivered to KHUT at his house.

63.     On July 30, 2005, CS6, at the direction of law enforcement, arranged to and met with KHUT to purchase an ounce of cocaine (28 grams), in exchange for $1,200. Surveillance observed CS6 pick up KHUT in front of KHUT's residence located at 135 Cross Street in Lowell, Massachusetts, drive around the block, and then drop KHUT off at his residence. CS6 received a white powdery substance from KHUT, which field-tested positive for the presence of cocaine. CS6 gave KHUT the $1,200. The transaction between CS6 and KHUT was consensually recorded. KHUT was identified by surveillance officers, some of whom are personally familiar with KHUT, from a comparison of Lowell booking photograph of KHUT, date of birth 09/03/73.

64.     On July 31, 2005, a series of conversations occurred regarding a narcotics transaction with MANY. At approximately 12:22, an outgoing call was placed on target telephone 1 to target telephone 2. "Magee" told "Hershey" that "Black" wanted to speak to him. "Blackie" then took the telephone and told "Hershey" that he had "served" "Chanda" the previous day and asked "how much was she supposed to pay you, 9 right?" "Hershey" stated yes. "Blackie" stated that he was just checking to see whether "Hershey" had lowered the price and "Hershey" said "hell, no." Then at approximately 12:23 p.m., an outgoing call was placed on target telephone 1 to (978) 996-9676. "Blackie" spoke to an unidentified male and instructed this person to tell "her" that "last night" "we were a hundred short." "Blackie" explained that he had counted it and it was "only 800." The male stated that he would let her know. I believe that MANY received an ounce of cocaine the previous evening, probably for redistribution; that was suppose to pay $900; and that MANY had only paid $800.

65.     On August 1, 2005, "Magee" was identified as Phan MOUL with a date of birth of December 1, 1980. The identification was based on the fact that the vehicle being driven by "Magee" is a green Nissan Maxima with Massachusetts registration number 99WJ44. According to the records of the Massachusetts Registry of Motor Vehicle, MA registration 99WJ44 is listed to Phan MOUL. A comparison of a prior booking photograph of MOUL by surveillance agents revealed that MOUL is the same person as "Magee."

66.     On August 1, 2005, at approximately 3:13 p.m., an incoming call was received on target telephone 1 from telephone number (603) 365-0978, which is subscribed to by Scott McDonald at 26 Cottonwood Drive in Hudson, New Hampshire.

24

"Magee" spoke to a male who was later identified as Scott MCDONALD. MCDONALD

stated that he wanted a "deuce" and they agreed to meet in fifteen minutes. I believe that

the reference to a "deuce" is a reference to two bags of cocaine. Surveillance was

established on "Magee." "Magee" was observed traveling to a parking lot, briefly

meeting with MCDONALD, and then leaving the area. MCDONALD, who had an

outstanding arrest warrant for motor vehicle violations and a suspended Massachusetts

driver's license, was pulled over shortly thereafter. As he was being placed under arrest,

MCDONALD tossed an Altoids tin out of the vehicle, which was found to contain a

substance that field-tested positive for cocaine. MCDONALD was released on bail the

following day.

      67.     At approximately 6:16 p.m., an incoming call was received over target

telephone 1 from (978) 996-3278. Magee talked to a male who has been identified as

SMILEY. During the call, SMILEY asked whether he was talking to "tear drop"

(referring to the tear drop tattoo on MAGEE's face) and MAGEE stated that it was he.

SMILEY then asked for "one" to be delivered at the same place on Smith Street.

      68.     In response to the call, agents responded to Smith Street and 1311

Middlesex Street in Lowell, MA. Upon arrival on Smith Street, agents observed three

Asian males hanging out in front of 190-194 Westford Street, who appeared to be waiting

for someone. At approximately 6:25 p.m., agents at 1311 Middlesex Street observed

Magee's green Nissan Maxima, MA registration 99WJ44 depart from that location

heading in the direction of Westford Street with two female occupants. At approximately

6:27 p.m., agents observed the Maxima pull into the driveway of 192-196 Smith Street,

Lowell, MA with a female driver with long blond hair. Agents observed one of the three

25

Asian males in front of the residence walk over to the Maxima. Less than a minute later, agents observed the Maxima depart and observed the three Asian males enter the residence. It is my opinion that the ounce of cocaine was delivered to SMILEY at Smith Street at this time.

69.     On August 1, 2005, at approximately 8:40 p.m., an incoming call was received on target telephone 1 from (978) 349-1122. "Magee" spoke to KHUT. KHUT told "Magee" that he needed "two onions" and asked "Magee" to bring it to his house on Cross Street. I believe that this conversation concerned narcotics and that "two onions" was a reference to two ounces of cocaine.

70.     On August 1, 2005, a series of calls occurred between target telephone 1 and target telephone 2. At approximately 9:14 p.m., "Magee" spoke to "Hershey." "Hershey" asked where "Magee" was and "Magee" stated that he had just finished his service with "onions." "Hershey" told "Magee" that he wanted to see him. At approximately 9:46 p.m., "Maggie" spoke to "Hershey" over the telephone and told "Hershey" that he was downstairs. At approximately 10:16 p.m., "Hershey" again spoke to "Magee" and asked "Magee" where he was. "Magee" stated that he was going there now and that he had "dropped off the other stuff." I believe that "Magee's" statements indicating that he had just finished his "service with onions" was a reference that he had delivered the cocaine to KHUT. I further believe that "Hershey" had wanted to see "Magee" so that "Magee" could make some narcotics deliveries for "Hershey."

71.     On August 2, 2005, at approximately 3:23 p.m., an incoming call was received on target telephone 1 from (603) 365-0978. "Magee" spoke to MCDONALD. MCDONALD asked "Magee" whether he had set him up the previous day and "Magee"

26

said no. MCDONALD told "Magee" that he had been arrested the previous day, right after they had been together. MCDONALD further stated that he had just been released. MCDONALD asked "Magee" whether he had "one" and "Magee" stated that they could meet in a half an hour. I believe that MCDONALD was inquiring whether "Magee" had any cocaine to sell and that MCDONALD and "Magee" were going to meet in 30 minutes so that MCDONALD could purchase cocaine from "Magee."

72.    On August 2, 2005, at approximately 3:46 p.m., an outgoing call was placed on target telephone 1 to target telephone 2. "Magee" spoke to "Hershey." "Magee" told "Hershey" that "Scott" had been locked up the previous day after the pick up. "Hershey" asked why Scott had been picked up and "Magee" stated "powder." I believe that this conversation concerned the fact that MCDONALD had been arrested the previous day in possession of powder cocaine.

73.    On August 3, 2005, agents received information from CS1 that "Hershey" had recently moved to 109 Forest Street, 2nd Floor, in Lowell, Massachusetts. On August 4, 2005, officers conducting surveillance observed "Hershey's" vehicle in the driveway to the left of the residence 109 Forest Street.

74.    On August 3, 2005, at approximately 9:16 a.m., an incoming call was received on target telephone 1 from target telephone 2. "Magee" spoke to "Hershey." "Magee" asked "Hershey" whether he remembered the kid with the "Mac 11." "Hershey" asked "you got it?" "Maggie" said yeah. "Hershey" asked how much and "Magee" said what do you mean "how much?" "Hershey" asked if "Magee" had "jacked it" and Maggie indicated that he had. Later in the conversation, "Hershey" stated "it's going to be in my hands" and told Magee, "there's a collection for that place". I believe

27

that the reference to the "Mac 11" was a reference to a gun and that "Magee" had taken the weapon from an unknown person, possibly by force. I further believe that Hershey wanted Magee to give him the gun and that Hershey would store it at a location where they had other guns.

75.    On August 3, 2005, at approximately 2:35 p.m., an incoming call was placed on target telephone 1 to target telephone 2. "Magee" spoke to "Hershey." Magee asked HERSHEY if he had "seen it" and HERSHEY answered, "Yeah". HERSHEY then told MAGEE, "the clip, there's something wrong with it." Magee asked "what's wrong" and HERSHEY answered, "the bullets keep coming back out." Later in the conversation Magee asked Hershey whether "you hold it, it goes," and Hershey stated, "it says semi on the top right there." Hershey further stated, "you got to do it one at a time, pop, pop, pop, pop, pop." I believe that during this conversation, Hershey had the MAC11 with him, possibly at his house and was inspecting and trying to load the weapon. In my opinion, Hershey was explaining to Magee that one bullet would fire with each pull of the trigger.

76.    On August 4, 2005, a series of conversations occurred on target telephone 1 regarding a delivery for FNU LNU a/k/a "Smiley." At approximately 1:32 p.m., an incoming call was received on target telephone 1 from telephone number (978) 996-3278. "Magee" spoke to FNU LNU a/k/a "Smiley." "Smiley" stated "bring me one" and "Magee" asked whether "Smiley" could wait a half an hour. "Smiley" said yes. At approximately 1:42 p.m., an outgoing call was placed on target telephone 1 to target telephone 2. "Magee" spoke to "Hershey." "Magee" asked "Hershey" whether "Smiley" should receive "the regular" or "cutting one." "Hershey" told "Magee" not to give him

28

the "cutting one." "Hershey" stated "regular, regular" and "pieces, pieces." At approximately 2:02 p.m., an outgoing call was placed on target telephone 1 to telephone number (978) 996-3278. "Magee" spoke to "Smiley." "Magee" told "Smiley" that he would be there in 2-3 minutes and that it wasn't the "cutting one" it was the "rock one." "Smiley" stated "big piece." At approximately 2:05 p.m., an outgoing call was placed on target telephone 1 and "Magee" told "Smiley" that he was downstairs. I believe that this series of calls concerned the sale of crack cocaine; that "Smiley" was the purchaser; that "Magee" had to check with "Hershey" regarding what should be sold to "Smiley" and that "Magee" had delivered crack cocaine to "Smiley."

77.    On August 4, 2005, at approximately 7:06 p.m., an incoming call was received on target telephone 1 from target telephone 2 . "Magee" spoke to "Hershey." "Hershey" told "Magee" that when he went back to the house to tell "Black" to give "Duffy" that "125" and that "he" wouldn't pay until later that evening. "Hershey" further explained that he wanted "him" to pick it up later that night. I believe that this conversation concerned the sale of 125 grams of cocaine; that "Hershey" wanted "Blackie" to deliver the cocaine to FNU LNU a/k/a "Duffy," and then "Blackie" was to collect the money later that evening.

78.    On August 5, 2005, CS6 at the direction of law enforcement arranged to and met with KHUT to purchase an ounce of crack cocaine (28 grams) in exchange for $1,400.  Surveillance observed CS6 enter and exit KHUT's residence located at 135 Cross Street, Lowell, MA.  While in KHUT's residence, CS6 received a white powdery substance from KHUT and at the direction of KHUT "cooked" the powder cocaine into crack cocaine.  CS6 gave KHUT $1,200 for the cocaine and $200 for the instruction

29

regarding the conversion process.  The transaction between CS6 and KHUT was consensually recorded.

79.    August 7, 2005, at approximately 7:19 p.m., an incoming call was received on target telephone 1 from (978) 349-1122.  "Magee" spoke to KHUT. "Magee" asked KHUT whether he was looking for something and KHUT said yes. "Magee" told KHUT that KHUT should not ask for "Bee" anymore because "Magee" would do it.  KHUT stated that he needed "six and a half" and asked how much for "six and a half."  "Magee" stated that he needed to contact his "homeboys" and indicated that he would call KHUT back.  I believe that KHUT wanted six and a half ounces of cocaine from "Magee" and that "Magee" was going to check with "Hershey" regarding the price.

80.    On August 7, 2005, at approximately 7:20 p.m., an outgoing call was placed on target telephone 1 to target telephone 2.  "Magee" spoke to "Hershey." "Magee" told "Hershey" that "Scrouch" needs "six and a half" and asked "Hershey" how much?  "Hershey" told "Magee" "5,250."  I believe that the "5,250" was a reference to dollars and that KHUT was to be charged $5,250 for the six and a half ounces of cocaine, which based on my experience, is a price consistent with market value for that quantity of cocaine.

81.    On August 7, 2005, at approximately 7:22 p.m., an outgoing call was placed on target telephone 1 to (978) 349-1122.  "Magee" spoke to KHUT.  "Magee" told KHUT that the total was "5250" and explained that "four and a half is 3500" and "two more is 875 each."  KHUT asked whether "Magee" would come to his house and explained that he had the "money over there."  "Magee" agreed.  I believe that the reference to "four and a half for 3500" is a reference to the fact that four and a half

30

ounces of cocaine was going to cost $3,500 and that each additional ounce would cost $875.

82.     On August 7, 2005, at approximately 7:23 p.m., an outgoing call was placed on target telephone 1 to (619) 549-5393. "Magee" spoke to "Blackie." "Blackie" told "Magee" "I got Srouch's shit here." I believe that this call was a reference to the six and a half ounces of cocaine that "Magee" was to deliver to KHUT and that "Blackie" had the cocaine in his possession for KHUT.

83.     On August 9, 2005, CS6 at the direction of law enforcement arranged to and met with KHUT to purchase an ounce of crack cocaine (28 grams) in exchange for $1,400. Surveillance observed CS6 enter and exit KHUT's residence located at 135 Cross Street, Lowell, MA. While in KHUT's residence, CS6 received crack cocaine. CS6 explained that CS6 was introduced to "Fly," an associate of KHUT's, and that "Fly" had been processing the cocaine from powder to crack cocaine. CS6 gave KHUT $1,400 for the crack cocaine. The transaction between CS6, KHUT and "Fly" was consensually recorded.

84.     On August 9, 2005, at approximately 9:26 p.m., an incoming call was received on target telephone 1 from target telephone 2. "Magee" spoke to "Hershey." "Hershey" told "Magee" that he needed "Magee" to deliver "some" to "Scott." I believe that "Hershey" wanted "Magee" to deliver narcotics to "Scott."

85.     On August 9, 2005, at approximately 10:38 p.m., an outgoing call was placed on target telephone 1 to (978) 726-2499. "Magee" spoke to FNU LNU a/k/a "Scott" a/k/a "Scotty." "Magee" asked "Scotty" whether they could meet at "the club on Middlesex." "Magee" explained that he had the "shit." "Scotty" agreed. I believe that

31

this conversation concerned the distribution of narcotics and that "Magee" was arranging to distribute an unknown quantity of narcotics to "Scotty" at 1311 Middlesex Street in Lowell per "Hershey's" previous instructions.

86.     On August 12, 2005, "BLACK" or "BLACKIE" was identified as Sakhorn SEAN, with a date of birth of February 27, 1985, from a Massachusetts Driver's license photograph of Sakhorn SEAN with residential address of 1311 Middlesex Street, Lowell, MA.  UC2, who previously purchased cocaine from BLACKIE in April of 2005, and other agents performing physical surveillance of BLACKIE identified BLACKIE from this driver's license photograph.  In addition, the electric subscribed to 1311 Middlesex Street, apartment #6 indicates that it is subscribed to SEAN with a contact telephone number of 978-726-8895, a telephone previously used by BEE.

87.     On August 15, 2005, at approximately 4:08 p.m., an incoming call was received on target telephone 1 from target telephone 2.  Magee spoke to Hershey. Hershey told Magee, "I have a mission for you," and stated that Magee could make "200."  Hershey further told Magee that he was at "Club 2."

88.     Agents identified as 30 Angle Street, apartment 37, Lowell, MA, as "Club 2."  Since the first week of August, 2005, agents performing undercover surveillance have observed Bee and Magee approaching the rear door to what was originally believed to be apartment #36 at 30 Angle Street.  Due to the location of the rear of 30 Angle Street and its surroundings, it had been very difficult for officers to perform surveillance without the risk of being detected and jeopardizing the investigation.  Hershey's green Nissan Maxima, MA registration 13VA32, had been seen recently parked at the rear of 30 Angle Street in the vicinity of apartments #35 - #37.  During intercepted conversations

32

over target telephones 1 and 2, Magee and Hershey have referred to apartment #37 as "Club 2," while referring to apartment #6 at 1311 Middlesex Street in Lowell as "Club 1."

89.     Following the interception of the call at 4:08 p.m. on August 15, 2005, agents responded to the area of 30 Angle Street and observed Magee departing from the rear of the apartment complex. Agents followed Magee to 1311 Middlesex Street, Lowell, MA. At approximately 5:05 p.m., Magee was observed departing from 1311 Middlesex Street. Agents followed Magee to an apartment complex in Lowell, MA called Camelot Court. On August 15, 2005, at approximately 5:11 p.m., an incoming call was received on target telephone 1 from target telephone 2. Magee spoke to Hershey. Hershey asked Magee where he was and Magee stated, "Scott's house."

90.     On August 15, 2005, at approximately 5:14 p.m., an incoming call was received on target telephone 1 from target telephone 2. Magee spoke to Hershey. Magee told Hershey that he was being followed by a "white dude" and accurately described one of the agent's undercover surveillance vehicles. Hershey told Magee, "maybe someone trying to hit your shit" and Magee responded, "trying to steal." I believe that this conversation concerned the fact that Magee had detected the surveillance. I further believe that Hershey was cautioning Magee that someone may be trying to steal his drugs.

91.     On August 17, 2005, at approximately 5:53 p.m., an outgoing call was placed from target telephone 1 to target telephone 2. During the call, MAGEE told HERSHEY that he was in the back.

92.     Agents responded to the area of 30 Angle Street, Lowell, MA and

33

observed MAGEE's green Nissan Maxima, Massachusetts registration 99WJ44, parked

behind the Registry of Motor vehicles building, which is located next to the rear of 30

Angle Street.   At approximately 6:00 p.m. on August 17, 2005, agents observed BEE

exit the rear of the apartment building at 30 Angle Street, Lowell, MA depart in Magee's

green Maxima.

93.    At approximately 6:21 p.m. on August 17, 2005, an incoming call was

received on target telephone 2 from (978) 606-8117, which is subscribed to Soda LOY,

109 Forest Street, Lowell, MA.  Hershey spoke with BEE.  BEE asked HERSHEY,

"anyone at home" and HERSHEY asked "why".  BEE stated that he wanted to "go pick

up the gat".  In response, HERSHEY stated, "go ahead, mine is under the bed."  BEE

asked, "Alright, you want me to bring yours too" and HERSHEY stated, "Yeah".  I

believe that BEE was telling Hershey that he was going to pick up his gun ("gat") at 109

Forest Street, Lowell, MA and Hershey told BEE to pick up his gun as well, which

Hershey stored under his bed at 109 Forest Street.

94.    At approximately 6:24 p.m. on August 17, 2005, agents located BEE

driving MAGEE's green Maxima in the area of Middlesex Street and Wilder Street in

Lowell, MA and followed him directly to 109 Forest Street, Lowell, MA.  At

approximately 6:35 p.m., agents observed BEE depart 109 Forest Street in the green

Maxima and followed him back to 30 Angle Street, Lowell, MA.  Agents observed BEE

park behind the registry of Motor vehicles building and walk towards the direction of the

rear door to apartment #35 - #37 at 30 Angle Street, Lowell, MA.  Agents called for

marked Lowell Police units to stop BEE but the units arrived moments after BEE had

entered the residence and therefore were unable to make the stop.

34

95.     At approximately 7:40 p.m. on August 17, 2005, an incoming call was intercepted over target telephone 2 to (978) 569-3144, which is subscribed to Peter Song 70 Queen Street, Lowell, MA. HERSHEY spoke with a male referred to as "Peter" during previous calls, whom I believe is Peter SONG. HERSHEY asked SONG, "If you ever get a chance to buy some bullets buy me some 380?" SONG asked, "buy what" and HERSHEY stated, "380 bullets." SONG told HERSHEY, "you give me some extra money, I'll buy it for you." SONG further told HERSHEY that he could buy the bullets the next day because the store closes at "8:30". I believe that Hershey was asking SONG to purchase bullets for the gun that BEE just picked up from 109 Forest Street and delivered to 30 Angle Street. I believe that Hershey asked SONG to purchase the bullets because he does not have an FID card or license to carry a firearm, which is required to purchase ammunition in the state of Massachusetts. I believe that Hershey knows this because he was previously arrested in Massachusetts for possession of ammunition without a license.

96.     Agents ran a check on Peter SONG, DOB: 10-31-1981, 70 Queen Street, Lowell, MA for a license to carry a firearm in Massachusetts. The check indicated that SONG has an active license to carry a firearm #12015672A, which was issued out of Lowell, MA and therefore would be able to purchase ammunition in the state of Massachusetts. At approximately 8:41 p.m. on August 17, 2005, an outgoing call was placed from target telephone 2 to (978) 726-3626, subscriber pending. Hershey spoke with a female. Hershey told the female not to let the "kid" into "BEE's room" because BEE left his gun on top of the bed. I believe that BEE left his gun on his bed at 109 Forest Street and therefore Hershey called his girlfriend to inform her of this so there

35

"kid" would not find the gun.

97.    Later on August 17, 2005, at approximately 8:54 p.m., a direct connect
call was received over target telephone 2 from a Nextel telephone with IMSI number
316010102273897, unknown subscriber. Hershey spoke with a male who was later
stopped by police and identified as Andre QUEZADA. QUEZADA asked Hershey if he
was "all set" and Hershey stated that he was "all set for a couple of days."

98.    On August 18, 2005, at approximately 5:21 p.m., an incoming call was
received over target telephone 2 from (978) 569-3144, which is subscribed to Peter Song
70 Queen Street, Lowell, MA. HERSHEY spoke with a male referred to as "Peter"
during previous calls, who I believe is Peter SONG. SONG told HERSHEY, "about the
bullets fucking, I only got ah two bouncer ... one of em 20 uh, remember what I gave
you?" Hershey stated, "alright that's fine" and SONG stated, "they ran out of hollow
tip." Song further stated, "I got you a box of the regulars too." I believe that SONG was
telling Hershey that he bought him a box of target type ammunition because the store was
out of Hollow point type ammunition, which is a type of bullet that mushroom out when
fired into someone, usually causes severe bodily injury and death.

99.    On August 19, 2005, at approximately 5:12 p.m., a call was received over
target telephone #2 from an unknown number, which did not display. Hershey spoke to
QUEZADA. QUEZADA stated, "this is a pre-paid" and told HERSHEY that he needed
to get one. Later in the call, QUEZADA asked HERSHEY whether they could do "one
today" and HERSHEY stated "yeah." QUEZADA told HERSHEY that he would get
"one" and another one the next day.

100.    Later on August 19, 2005, at approximately 9:12 p.m., a direct connect

36

call was received over target telephone 2 from a Nextel telephone with IMSI number 183-913-2225. Hershey spoke with QUEZADA. HERSHEY told Quezada that he would see him the next day. QUEZADA told HERSHEY, "the guy is going to bring me in a half an hour" and told HERSHEY to hit him up the next day.

101.    Later on August 20, 2005, at approximately 11:55 a.m., a direct connect call was received over target telephone 2 from a Nextel telephone with IMSI number 183-913-2225. HERSHEY spoke with QUEZADA. HERSHEY told QUEZADA that he wanted to wait till later in the evening. QUAZADA offered to "drop it off" and then "pass by" again later (possibly for the money). HERSHEY told QUEZADA that he would not be home but would have "10" for him, believed to be a reference to $10,000.

102.    On August 20, 2005, at approximately 7:44 p.m., a direct connect call was received over target telephone 2 from a Nextel telephone with IMSI number 183-913-2225. HERSHEY spoke with QUEZADA. QUEZADA said he would meet HERSHEY in an hour.

103.    In response to this call, surveillance was established in the vicinity of 1311 Middlesex Street and officers observed HERSHEY's green Nissan Maxima 13VA32 parked in front of the residence.

104.    At approximately 9:14 p.m. on August 20, 2005, a direct connect call was received over target telephone 2 from a Nextel telephone with IMSI number 183-913-2225. HERSHEY spoke with QUEZADA. QUEZADA told HERSHEY that he was "heading over" to see him.

105.    A minute later, an incoming call was received on target telephone 2 from (978) 606-8117, which is subscribed to Soda LOY, 109 Forest Street, Lowell, MA.

37

Hershey spoke with BEE. HERSHEY told BEE to go to the house and get the "money" by the "computer table" because "DREY" was going over there.

106.    At approximately 9:18 p.m. on August 20, 2005, agents conducting surveillance at 1311 Middlesex Street observed BEE depart the residence and drive to 109 Forest Street.

107.    At approximately 9:25 p.m. on August 20, 2005, an incoming call was received on target telephone 2 from (315) 489-1930. Hershey spoke with BEE. BEE asked HERSHEY if he wanted him to bring all the money and HERSHEY stated, "nine thousand seven hundred."

108.    At approximately 9:27 p.m. on August 20, 2005, agents observed BEE exit 109 Forest Street and drive back to 1311 Middlesex Street and enter the residence.

109.    At approximately 9:44 p.m. on August 20, 2005, agents observed QUEZADA arrive at 1311 Middlesex Street in a gray Ford Taurus, MA Reg. 72EJ47 and enter the residence. As QUEZADA was entering the residence, agents observed QUEZADA making or receiving a call on his cellular telephone.

110.    At approximately 9:45 p.m. on August 20, 2005, a direct connect call was received over target telephone 2 from a Nextel telephone with IMSI number 183-913-2225. HERSHEY spoke with QUEZADA. QUEZADA stated "you're not here" and HERSHEY told QUEZADA that his "brother" was there. HERSHEY further told the QUEZADA that there was "97 right there."

111.    At approximately 9:49 p.m., agents observed QUEZADA depart 1311 Middlesex Street in the gray Ford Taurus. Agents maintained surveillance on the Taurus.

112.    At approximately 9:50 p.m. on August 20, 2005, a direct connect call was

received over target telephone 2 from a Nextel telephone with IMSI number

316010102273897, unknown subscriber. Hershey spoke with QUEZADA. QUEZADA

told HERSHEY, "I saw the thing right, everything it looked good, I put some tape over it.

You know how it is." I believe that QUEZADA's reference to examining the product

and putting some tape over it pertains to a small, square-shaped incision in the wrapper of

a kilogram of cocaine that was seized from 30 Angle Street on August 21, 2005

(described below). The piece of the kilo wrapper that had been removed by square-

shaped incision had been returned to its place. HERSHEY told QUEZADA that he

would check it out.

113.   At approximately 10:00 p.m. on August 20, 2005, a marked Lowell Police

unit stopped QUEZADA as he was entering the Lowell Connector. QUEZADA was

arrested for an active arrest warrant. During an inventory search of his vehicle, $9,000 in

currency was found in the glove compartment. During the booking process, an additional

$700 in cash was found on QUEZADA.

114.   At approximately 10:05 p.m. on August 20, 2005, an outgoing call was

received on target telephone 2 from (978) 606-8117, which is subscribed to Soda LOY,

109 Forest Street, Lowell, MA. Hershey spoke with BEE. HERSHEY asked if BEE saw

DREY and BEE stated that he did. HERSHEY then asked if BEE "looked at the stuff"

and BEE stated that it was "good" but not "Beige" or anything like that. BEE then

agreed to bring "it" to HERSHEY.

115.   At approximately 10:15 p.m. on August 20, 2005, agents observed BEE

exit 1311 Middlesex Street with a white bag, which he placed in the trunk of

HERSHEY's green Maxima 13VA32. BEE then departed and was followed by agents.

39

116.    At approximately 10:20 p.m. on August 20, 2005, an incoming call was received on target telephone 2 from (978) 606-8117. Hershey spoke with BEE. BEE told HERSHEY that he was being followed and told HERSHEY to open the garage door for him. At the same time, agents observed BEE drive into the front of 30 Angle Street, Lowell, MA.

117.    HERSHEY then made a series of calls to MAGEE telling MAGEE to get everything out of the house. MAGEE was later located at a relative's home at 16 Union Street in Lowell. Officers stopped MAGEE as he drove from the area and placed him under arrest. Officers then went to apartment #8 at 16 Union Street and spoke to MAGEE's sister, Phar Moul, who directed officers to a trash barrel inside the residence. Inside that barrel officers found one plastic bag containing a rock like substance that appeared to be cocaine. From there, officers went to the residence of Jennifer Huynh at 782 Merrimack Street, first floor, Lowell. Interceptions over the target telephones indicated that MAGEE had dropped off items that he had removed from 1311 Middlesex Street at 782 Merrimack Street. Officers spoke to Huynh, who directed them to a DVD player. Inside the DVD player officers found what appeared to be several bags of cocaine.

118.    At approximately 11:28 p.m. on August 20, 2005, agents responded to 30 Angle Street, Lowell, MA. At the same time, an incoming call was received on target telephone 2 from (978) 767-5466. Hershey spoke with female who was later identified Yessenia ABREU, who was present inside the apartment #37 at 30 Angle Street. ABREU told HERSHEY that the police were outside knocking on the door. At approximately 11:31 p.m. an outgoing call was received on target telephone 2 from (978)

40

767-5466. Hershey spoke with ABREU. HERSHEY told ABREU to go downstairs, get

the stuff and hide it. HERSHEY further told her to do it in the "dark and don't make any

noise." At this point, agents forced entry into the residence and performed a protective

sweep.1    ABREU was found in a bedroom on the third floor of the residence. The

apartment was secured pending application for a search warrant for the premises.

119.    At approximately 5:30 a.m. on August 21, 2005, the Lowell District Court

issued a warrant authoring officers to search 30 Angle Street, #37, Lowell MA, for

cocaine and drug-related paraphernalia as well as firearms and ammunition. After a

signed warrant arrived at the location, officers and agents search the premises. Inside

small room off the garage to apartment #37, officers and agents located one brick-shaped

package covered with brown tape in a cellophane bag that was consistent in size and

shape with a kilogram of cocaine. There was a small square cut from the middle of the

package exposing white powder that appeared to be, in my experience and training,

cocaine. A field test of the substance indicated positive to the presence of cocaine. In

addition, officers located a shoebox that contained various individual packages of

powdered cocaine (weighing approximately 700 grams) and approximately 80 grams of

crack cocaine (including the weight of the packaging). Inside that same room officers

found two handguns: a 9 mm with an obliterated serial number and a .380 caliber semi-

automatic. Loaded magazines inside the weapons and boxes of ammunition were also

discovered. Police also found a scale, a cocaine grinder and a press.

120.    While waiting for the warrant to issue for 30 Angle Street, #37, agents and

---

1 Agents initially entered apartment #36, but discovered that Hershey resided in #37 at 30 Angle Street.
Immediately thereafter, police went to #37 and knocked and announced their presence. Having received no
response to their announcement, and learning of Hershey's instruction to Abreau over target telephone 2 to
get the drugs and hide them, police then made a forced entry into apartment #37.

41

officers responded to 109 Forest Street, #2, Lowell, after calls intercepted over target telephone 1 indicated that Hershey and Bee were going to flee the area.     Sometime around midnight, officers knocked on the door to 109 Forest Street, and announced their presence.   Through the window of the door to the front entrance to apartment #2, two men (later identified as Hershey and Bee) were observed standing at the top of the stairs on the second floor.   After a short time, one of the men stated that they were coming down to turn themselves in.   Hershey and Bee then opened the door to the building and were placed under arrest.   Contemporaneous with the arrests, I asked Hershey whether there were any guns on him or inside the building out of concern for arresting officers and people who might be inside the building.   Hershey responded that there were two guns at the top of the stairs in a laundry basket.   Officers located the laundry basket at the top of the stairs and found two fully loaded handguns (one was a .44 magnum revolver and the second was a .380 semi-automatic).

121.     I then spoke to Hershey's girlfriend, Soda Loy, who gave me permission to look around the apartment.   On a computer table in a hallway I observed a small bag containing a white powder consistent in appearance with cocaine.   Two boxes of ammunition were also found inside a bedroom.

122.     During the evening of August 20, 2005, CS6 at the direction of law enforcement made arrangements with KHUT to purchase cocaine from him on August 21, 2005.   However, KHUT did not return any of CS6's calls on August 21, 2005. Consequently, in the early afternoon of August 21, 2005, agents and officers went to the residence of KHUT at 135 Cross Street, #4. Lowell.   Officers knocked at the entrance to 135 Cross Street, #4, and announced their presence several times without receiving a

response. Officers then made forcible entry into the apartment and found KHUT in his bedroom. He was placed under arrest and the apartment was secured pending an application for a search warrant.

123.    At approximately 4:00 p.m., the Lowell District Court issued a warrant authorizing the search of 135 Cross Street, #4, Lowell, for cocaine and drug-related paraphernalia. Inside KHUT's residence officers found a cigarette package containing approximately 10 small packets of crack cocaine. A bag containing cocaine powder was also found on a nightstand inside a bedroom in the apartment. An additional quantity of crack cocaine was found inside a rental vehicle parked outside 135 Cross Street. Sambath Chan, KHUT's girlfriend, permitted officers to search the rental vehicle.

124.    Based on the information contained in this Affidavit, all of which is true and accurate to the best of my knowledge, information and belief, I believe there is probable cause to believe that Sophoan Oung ("Hershey"), Sophanara Oung ("Bee"), Sokham Sean ("Blackie"), Phan Moul ("Magee"), Srouch Khut, and Andre Quezada (a.k.a. Gilbert Quezada), have engaged in a conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846; the possession of firearms and ammunition, in violation of 21 United States Code 924; and aiding and

43

abetting the above offenses, in violation of Title 18, United States Code, Section 2.

Signed under the pains and penalties of perjury this 22nd day of August, 2005.

Christian Brackett
Special Agent,
Drug Enforcement Administration


Sworn to and subscribed before me the 22nd day of August, 2005.

JUDITH G. DEIN
United States Magistrate Judge

44